DAVID B. GOLUBCHIK (SBN 185520)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DBG@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>JAMES ALEXANDER,<br><br>       Debtor and Debtor in Possession. | Case No.: 1:21-bk-10214-MB<br><br>Chapter 11<br><br>**DEBTOR'S OPPOSITION TO JOINT EMERGENCY OMNIBUS MOTION FOR (I) RELIEF FROM THE AUTOMATIC STAY AND (II) TRANSFER OF VENUE**<br><br>[Supporting Declaration Filed Concurrently Herewith]<br><br>Hearing:<br>Date: February 16, 2021<br>Time: 2:30 p.m.<br>Courtroom: 21041 Burbank Boulevard,<br>          Woodland Hills, CA 91367<br>           Courtroom 301 |

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE:**

James Alexander, the Chapter 11 debtor and debtor in possession herein ("Debtor"), hereby files his Opposition to the Joint Emergency Omnibus Motion For (i) Relief From The Automatic Stay and (ii) Transfer Of Venue (the "Motion") filed by the bankruptcy estates of Cred, Inc. ("Cred") and Cred Capital, Inc. ("Cred Capital" and collectively with Cred, the "Cred Debtors").  This Opposition is based on this pleading, and the accompanying Declarations of James Alexander and David B. Golubchik.

The Cred Debtors' cases are cases about a business divorce between the Debtor herein, as the initial and sole director of Cred Capital, and Daniel Schatt, CEO of Cred who "reincorporated" Cred Capital and placed himself as the sole director to the exclusion of the Debtor.  The Debtor, believing that Mr. Schatt lacked authority to take such unilateral action and with the intent to allow Cred Capital to continue to conduct its operations, transferred 225 Bitcoin assets to an account under his control, which was utilized to maintain operations and compensate employees, consultants and other professionals.

When litigation ensued and, specifically, the Cred Debtors' bankruptcies were commenced, a turnover adversary proceeding was initiated by the Cred Debtors against the Debtor.  As set forth in the accompanying Declaration of the Debtor, the Debtor lacked resources to continue with the Cred Debtors' litigation and determined that commencement of this case was necessary and proper.  As a result, the Debtor turned over all of the Cred Debtors' assets which were in the Debtor's possession, custody or control [See Exhibit "B" to Declaration] to the Cred Debtors and commenced this case.

Upon commencement of this case, the Debtor opened the required Debtor in Possession account and transferred pre-petition funds, as well as all cash in his possession, custody or control into the DIB account.  See Exhibit "C" to Declaration.

The Debtor has no remaining assets of the Cred Debtors in his possession, custody or control.  The Debtor also has no assets with which to employ counsel to continue with the

defense of the litigation.  There is no "cause" in existence to support relief from stay to proceed with litigation.

There is also no basis to transfer venue of this case to Delaware considering that the Debtor has lived in California for over a decade, maintains his assets in California, has creditor representatives in California and commenced his bankruptcy case in California.

Finally, as a showing of good faith that the Debtor has no interest in taking any questionable actions, the Debtor consents to the conversion of this case to one under Chapter 7 of the Bankruptcy Code to allow a neutral trustee to take possession of all nonexempt assets and conduct whatever investigation the trustee deems appropriate.

**I.**

**NO EXISTENT CIRCUMSTANCES EXIST**

**NECESSITATING AN EXPEDITED HEARING**

It is not surprising that the Court scheduled this hearing on, essentially, one (1) business day notice (considering the long holiday weekend).  The picture painted by the Motion was grim:

1. The Debtor stole over $10 million dollars from the Cred Debtors;

2. The Debtor is hiding money in cash "in his trunk"; and

3. Unless immediate relief is granted, over 6,500 investors in the Cred Debtors will be irreparably harmed.

Unfortunately, the Motion and the Cred Debtors were not truthful with the Court and did not disclose the real facts, including the following:

1. On February 5, 2021, the Debtor turned over all cryptocurrency assets in his possession, custody or control to the Cred Debtors;

2. Upon commencement of the case, discussions (oral and written) between Debtor's counsel (David Golubchik) and Cred Debtors' counsel (Timothy Walsh) were held where Mr. Golubchik confirmed that all pre-petition funds, including all cash, were deposited into the DIP account.

Had the foregoing been disclosed, it would be clear that there was no emergency and, certainly, no reason to have a hearing on one (1) business days' notice.  It appears that the Cred

Debtors pick and choose which facts are convenient to present to this court and which should be ignored.

**II.**

**REQUEST FOR RELIEF FROM STAY SHOULD BE DENIED**

**A.    No "Cause" Exists.**

According to the Motion, the Cred Debtors assert that "cause" exists to support relief from stay because:

>    (i)    the Movants need to find out where the Cred assets are located before Alexander moves them again (*e.g.*, $60,000 in the trunk of Alexander's car);
>
>    (ii)    Alexander has proven that he is untrustworthy and has shown total disregard for court orders; and
>
>    (iii)    the Chapter 11 Case was filed in bad faith.

See Motion at Par. 21.

As set forth in the accompanying Declaration of the Debtor, all cryptocurrency assets in the Debtor's possession have been turned over to the Cred Debtors and all cash and pre-petition funds have been deposited into the DIP bank account.  As a result, the funds (whether cash or otherwise) do not support "cause" for relief from stay.

The only remaining issue is "bad faith" bankruptcy filing.  The Motion assert that this case was file not for a respite and the automatic stay, but rather to thwart the Delaware Court's enforcement efforts.  Not surprisingly, other than speculation, no evidence is offered to support such a self-serving conclusion.

As made clear by the accompanying Declaration of the Debtor, the Debtor lacked the financial ability to continue defending himself in the litigation brought by the Cred Debtors and their teams of attorneys billing a 4-digit rates.  Based on the foregoing, the Debtor determined that the commencement of this bankruptcy case was necessary.  Such action is consistent with the scope and purpose of the Bankruptcy Code and entirely appropriate.

The Cred Debtors' baseless arguments may make some sense if the Debtor chose to retain the cryptocurrency assets as part of his bankruptcy filing. He did not, however. All such assets were turned over to the Cred Debtors. See **Exhibit "B"** to Debtor's Declaration.

The Cred Debtors' arguments make some sense if the Debtor chose to hide or not disclose cash in his possession. He did not, however. All pre-petition funds, including cash "in his trunk" have been deposited into the DIP bank account. See **Exhibit "C"** to Debtor's Declaration.

More importantly, based on the Debtor's consent to convert this case to Chapter 7 and to turn over all non-exempt assets to the trustee, there can be no question that the Debtor is proceeding in good faith.

There is no showing of "bad faith" to support relief from stay for "cause".

Once the facts are considered, the Cred Debtors are pre-petition creditors of the Debtor. They are free to file proofs of claims to support their claims. If an objection is not filed, the claims are deemed "allowed". No further litigation may be necessary in this case.

**B.    A Comfort Order is Unnecessary and Improper.**

Cred Debtors' next argue that the automatic stay does not apply to investigation of transactions to third parties. Such position is not well-founded and should not be considered by the Court for the following reasons:

1. Cred Debtors seek to proceed with an adversary proceeding commenced against the Debtor pre-petition. Such "action" is stayed by 11 U.S.C. § 362(a). To the extent that the Cred Debtors seek to conduct discovery in that same adversary proceeding, the stay would apply nevertheless.

2. To the extent that there are claims relating to the Debtor's transfer of assets to third parties, such as fraudulent conveyance claims, they are usurped by the Debtor's bankruptcy estate. It is the Debtor's estate that has the standing to pursue such claims. And, in this case, where a Chapter 7 trustee will be appointed, the Chapter 7 trustee will have the standing to investigate and pursue claims.

### III.

### REQUEST FOR TRANSFER OF VENUE SHOULD BE DENIED

The Motion does not contend that the Debtor's case was filed in the wrong venue. Rather, the Motion argues that a venue transfer "serves the convenience of the parties."

However, a debtor's choice of forum is entitled to great weight if venue is proper. In re Enron, 274 B.R. 327, 342 (Bankr.S.D.N.Y.2002); In re Delaware and Hudson RR, Co., 96 B.R. 469, 473 (D.Del.1988) aff'd, 884 F.2d 1383 (3d Cir. 1989). "Transferring venue of a bankruptcy case is not to be taken lightly." In re Enron, 274 B.R. at 342; see also Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.), 596 F.2d 1239, 1241 (5th Cir.1979). Consequently, "[w]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." In re Enron, 274 B.R. at 342-343.

Here, the Debtor chose to file in the Central District of California. The Debtor is a resident of California and has lived here for over a decade. The Debtor's real property is located in California. The Debtor's personal property is located in California. The Debtor's banking and financial creditors are located in California. The Debtor determined that the filing in the current venue is necessary, proper and in the best interest of all creditors.

In addition to placing "great weight" on a debtor's choice of venue, courts consider the following factors to determine whether to transfer a bankruptcy case: (i) the proximity of creditors to the Court; (ii) the proximity of the debtor to the Court; (iii) the proximity of witnesses necessary to the administration of the estate; (iv) the location of the debtor's assets; (v) the economic administration of the estate; and (vi) the necessity for ancillary administration if liquidation should result. In re Enron, 274 B.R. at 343. The factor given the most weight is the promotion of the economic and efficient administration of the estate. Id. Contrary to Cred Debtors' skewed analysis of these factors, these factors weigh heavily toward retention of venue in California.

1. The relationship between the Debtor and the Cred Debtors is simply a debtor (Debtor) – creditor (Cred Debtors) relationship.  All of the cryptocurrency assets have been turned over.  Debtor has no ongoing business relationship with the Cred Debtors.  The only thing remaining is, arguably, and claim that the Cred Debtors seek to assert against the Debtor, which can be done through a proof of claim filing.  Transferring venue to Delaware would not promote economic and efficient administration of the Debtor's estate.

2. Virtually all creditors of the Debtor (through representative offices) have presence in California and proximity to the Court weighs in favor or not transferring venue.  Other than the pending Cred Debtors' bankruptcy cases, even the Cred Debtors were based in California.

3. The Debtor resides in California and has his come in California.  Clearly, his proximity to court favors retaining the case in California.

4. The witnesses, if any, are California-based.  In fact, the primary witness, Daniel Schatt, is based on California as evidenced by his executed Declaration which is attached hereto as **Exhibit "D"**[1].

5. The Debtor's assets are located in California.  The Debtor has no assets in Delaware.

6. Finally, in light of the Debtor's turnover of all cryptocurrency assets, there is no need for ancillary administration by the Delaware court.  This court is well-equipped to address any issues that arise.

For the foregoing reasons, change for venue, especially on such short notice, is not appropriate.

///

///

///

---

[1] Pursuant to Rule 201 of the Federal Rules of Evidence, Debtor respectively requests that the Court take judicial notice of Mr. Schatt's executed and filed declaration, the original of which is on file with the Clerk of the Delaware Bankruptcy Court.

## IV.

### CONCLUSION

This is a business divorce with one former "partner" seeking a "pound of flesh" and punitive measures against the other. Assets have been turned over. Bankruptcy was commenced and the automatic stay is in effect. No "Cause" has been shown to exist to support relief from stay. No basis has been provided for a change of venue. And, certainly, not on effectively a one (1) business day notice proceeding. The Motion should be denied in its entirety.


Dated:  February 16, 2021               JAMES ALEXANDER

                                        By:___*/s/ David B. Golubchik*___
                                            DAVID B. GOLUBCHIK
                                            LEVENE, NEALE, BENDER,
                                            YOO & BRILL L.L.P.
                                            Proposed Attorneys for Debtor-In-
                                            Possession

**EXHIBIT "D"**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (___) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DANIEL SCHATT IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Daniel Schatt, hereby declare under penalty of perjury as follows:

1.      I am the co-founder and Chief Executive Officer of Cred Inc. ("Cred") and its

chapter 11 debtor affiliates (as debtors and debtors in possession, the "Debtors"). The Debtors

operate a global financial services platform serving retail and institutional clients in 183

countries. The Debtors, which are licensed lenders, utilize proprietary technology to provide

business and retail credit and to allow their customers to earn a yield on more than 15 crypto and

fiat currencies through their partner network. I am generally familiar with the day-to-day

operations, affairs, and books and records of the Debtors.

2.      I have over 20 years' experience working in the finance and financial technology

sectors. My previous experience includes tenures with investment bank Salomon Smith Barney,

financial services industry analyst firm Celent, and financial technology platform Yodlee. More

recently, I served as the General Manager for Financial Innovations for PayPal from 2007 to

2013, and as the Chief Commercial Officer for Stockpile Inc. from 2013 to 2018. I hold both a

Master of Business Administration degree and a Master of Internal Affairs degree from

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred
Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third
Avenue, San Mateo, California 94401.

Columbia University.  I also hold a bachelor's degree in Law and Society from the University of

California, Santa Barbara.  I am also the author of *Virtual Banking (Wiley 2013)*.

3. On November 7, 2020 (the "Petition Date"), the Debtors filed their voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in this Court.  The Debtors also filed a number of motions and applications (collectively,

the "First Day Motions") in order to allow the Debtors to continue to operate in Chapter 11 with

minimum disruption or loss of value.  I am familiar with the contents of each of the First Day

Motions and believe that the relief sought in each of the First Day Motions is necessary to ensure

a successful restructuring of the Debtors.

4. I submit this declaration in support of the First Day Motions pursuant to 28

U.S.C. § 1746 (the "First Day Declaration").  Except as otherwise indicated herein, all facts set

forth in this First Day Declaration (a) are based on my personal knowledge and/or information

supplied to me by others at the Debtors and the Debtors' professionals, (b) were learned from my

review of relevant documents, or (c) are my opinion based upon my experience and knowledge

of the Debtors' operations and financial condition.  I am over the age of 18 and authorized to

submit this First Day Declaration on behalf of the Debtors.  If called upon to testify, I could and

would testify competently to the facts set forth herein.

5. This First Day Declaration is divided into six parts.  Part I of this First Day

Declaration describes the nature of the Debtors' business.  Part II provides a brief history of the

Debtors.  Parts III and IV describe the Debtors' corporate and capital structures, respectively.

Part V discusses the events leading up to the Debtors' chapter 11 filings.  Part VI provides

support for the facts underlying each of the First Day Motions.

### Overview of the Debtors' Business

6.  The Debtors operate a financial technology platform through which customers transfer cryptocurrency to the Debtors—generally through a loan agreement or financing agreement.[2] The Debtors then utilize such cryptocurrency in a variety of investment strategies involving third-party asset managers. The Debtors earn revenue through the the the returns generated through their investments, as well as through interest on lines of credit extended to certain of the Debtors' customers in connection with the loans and financings referenced above.

7.  In general, the Debtors have two types of customers: (a) retail investors who transfer (via a pledge or loan) their cryptocurrency to the Debtors through certain e-wallet partners and (b) high net worth individuals who transfer (via a pledge or loan) their cryptocurrency directly to the Debtors. Approximately half of the Debtors' business is generated through e-wallet services that partner with the Debtors. E-wallets are platforms through which end-users (which may be individuals or companies) manage and store their cryptocurrency.

8.  As mentioned above, after receipt of cryptocurrency from a customer, the Debtors work with outside asset managers who focus on investment strategies that are expected to generate a return for the Debtors. These strategies include writing out-of-the-money covered calls and arbitrage strategies. In general, the Debtors seek strategies that generate a consistent return while minimizing risk of loss.

9.  In addition to its investment services, the Debtors also provide lending services to certain customers. These borrowing services are limited to domestic customers.

---

[2] Shortly before the petition date, the Debtors began using contracts to "rent" cryptocurrency from customers. As of the filing date, rental contracts account for less than 1% of the Debtors' customer contracts.

10.    The Debtors operate from California, but their customer base is located across the globe.  Among others, the Debtors have partnered with e-wallet services based in Canada and the European Union.

## Corporate Formation

11.    I founded Cred together with my business partner Lu Hua in 2018.  I met Mr. Hua during our overlapping tenure at PayPal.  Mr. Hua and I founded Cred in 2018 to give businesses and individuals an opportunity to earn a return on cryptocurrency assets and borrow against such assets.  Cred was incorporated in May 2018 and launched with its first partner in early 2019.

## Corporate Structure

12.    The Debtors consist of five entities, with Debtor Cred as the corporate parent. Mr. Hua and myself each own 50% of the equity in Cred.  Cred has four direct, wholly-owned subsidiaries:

- Debtor Cred (US) LLC handles borrowing and lending for domestic customers (while Cred handles business with international customers);

- Debtor Cred Capital was formed in March 2020 for the purpose of selling securities products;

- Debtor Cred Merchant Solutions LLC was formed in October 2019 for the purpose of facilitating the purchase of crypto assets at the physical point of sale.  However, as of the Petition Date Cred Merchant Capital has no business and no assets.

- Cred Puerto Rico LLC was formed in March 2020 for the purpose of facilitating transactions for residents in Puerto Rico.

13.    All Debtor entities, other than Cred (Puerto Rico) LLC,[3] are incorporated in Delaware and have their principal place of business in California.

---

[3]    Cred (Puerto Rico) LLC is an LLC formed under the laws of Puerto Rico.

**Capital Structure**

14.     The Debtors have not issued any secured debt.

15.     In August and September 2020, Cred issued approximately $2.6 million in
unsecured convertible notes (the "Convertible Notes") through a private placement.  The
Convertible Notes bear interest at a rate of 3% per annum and have a stated maturity date in
September 2024.  As of the Petition Date, approximately $2.6 million (which includes accrued
interest) remains outstanding on the Convertible Notes.  Other than the Convertible Notes, the
Debtors do not have any outstanding funded debt.

16.     As of the Petition Date, the Debtors' liabilities to customers were approximately
$140 million.  Because of the nature of the Debtors' business, the Debtors' liabilities to
customers fluctuate with changes in the price of cryptocurrency.

17.     The Debtors have ordinary course trade debt of approximately $1 million.

**Events Leading to Chapter 11 Filing**

18.     The Debtors' chapter 11 filings were necessitated by a confluence of events that
culminated in mid-October, resulting in a significant deterioration of the Debtors' balance sheet.
Of particular note, a material loss connected with the onboarding of a fraudulent asset manager
by former Chief Capital Officer, James Alexander, and his misappropriation of certain Debtors'
digital assets severely impaired the Debtors balance sheet and limited the ability to hedge their
investments against fluctuations in the price of cryptocurrency.  Additionally, significant time,
attention, and legal costs had to be devoted to litigating against Mr. Alexander.

19.    In the early stages of its operations in 2019, the Debtors invested most of their cryptocurrency assets with moKredit[4] and dedicated a portion of their assets to hedge against crypto pricing volatility.   Loans to moKredit generally earned interest of approximately 15% to 24% per annum.  As of the Petition Date, approximately $39 million in loans to moKredit remained outstanding.  By the end of 2019, the Debtors had a positive net income and a balance sheet reflecting an asset to liability ratio of 1.2.

20.    The Debtors entered 2020 with the goal of diversifying their fund allocations.  In particular, the Debtors' leadership team decided to cease any new loans to moKredit and to allocate all new incoming funds to U.S. asset managers in the form of in-kind placements rather than in the form of U.S. stablecoin,[5] which the Debtors had initially utilized.  The decision was prompted in part by the growing COVID-19 crisis in China, as well as new regulations that reduced the income the Debtors could generate from moKredit.  In addition, placing funds in-kind with U.S. asset managers would lessen the necessity to hedge cryptocurrency, lower the Debtors' exposure to moKredit, and allow the Debtors to return funds to customers in the same form as initially transferred without additional conversion.  Cred began to execute this strategy in January and February 2020.

21.    In March 2020, as the COVID-19 crisis prompted the price of bitcoin to drop more than 50% from its February 2020 high, the Debtors found themselves without sufficient reserves to maintain some of their hedging positions, thereby leaving the Debtors short on bitcoin as prices rebounded. Mr. Hua also provided 300-bitcoin loan to Cred to assist the Debtors

---

[4]    moKredit (which was founded by Mr. Hua) provides alternative payment services to online gaming publisher sites through the provision of credit (in the form of gaming tokens) to video game enthusiasts.

[5]    Stablecoin is a type of cryptocurrency that can be pegged to value of fiat currency, commodities, or other "stable" assets as a means of reducing price volatility.

with establishing new hedging positions.  Notwithstanding the significant pricing volatility in

March 2020, the Debtors ended the first quarter of 2020 with an asset to liability ratio around

1.0.

22.    Also in March 2020, the Debtors directed their then-Chief Capital Officer, Mr.

Alexander, to incorporate Cred Capital as a Delaware entity that would be controlled by Cred for

the purposes of (a) creating a vehicle that would assist the Debtors with arranging (through a

Luxembourg vehicle) bond offerings for companies in need of capital and (b) oversee the

Debtors' asset management strategies.  However, in violation of this directive, Mr. Alexander

instead tried to install himself as the sole director of Cred Capital.  Moreover, rather than

assigning the majority of Cred Capital's voting shares to Cred, Mr. Alexander assigned only

Class B, non-voting shares to Cred, and assigned Class A voting shares to a purported third-party

"investor" who purported to give Mr. Alexander a proxy to control the vote on the Class A

voting shares.  Notwithstanding the agreement with the purported investor, Cred Capital never

received the promised capital contribution from such investor.

23.    Worse, Mr. Alexander did not use the proceeds of Mr. Hua's loan of 300 bitcoin

to establish hedging positions as he had been instructed to do, but instead used a portion of the

loan to make a series of vendor payments in connection with establishing Cred Capital.

24.    Upon discovery of the foregoing, the Debtors directed Mr. Alexander to take

corrective action; however, despite still being an employee of the Debtors at that time, Mr.

Alexander refused to comply.  Thereafter, in late June 2020, Mr. Alexander was terminated as an

employee and was locked out from access to the Debtors' systems.  The Debtors were forced to

file a corrected corporate charter for Cred Capital to regain ownership and control of Cred

Capital and correct the stock ownership.

25.     In July 2020, the Debtors also discovered that Mr. Alexander had absconded with the remaining bitcoin loaned by Mr. Hua - currently worth over $3 million - that had been intended to establish hedging positions for the Debtors, and moved the assets to a private e-wallet.  Despite the Debtors' demands, Mr. Alexander has refused to return these assets to the Debtors.

26.     Shortly thereafter, the Debtors commenced litigation against Mr. Alexander in California state court seeking, among other things, injunctive relief to prevent Mr. Alexander from any further dissipation of the Debtors' property, an award of compensatory and punitive damages due to Mr. Alexander's improper and illegal conversions, breach of his employment contract, breach of implied covenant of good faith and fair dealing, and breach of employee loan agreement, among other things.[6]

27.     Litigation remains pending.  Notably, on July 17, 2020, the California state court granted Cred and Cred Capital's motion for a temporary restraining order requiring the preservation of the digital assets Mr. Alexander transferred from Cred Capital.  However, as a result of Mr. Alexander's actions and the pendency of litigation, Cred currently does not have access to the approximately $3 million worth of bitcoin and stable coin misappropriated by Mr. Alexander.

28.     While the Debtors' asset management strategy again delivered significant returns in July and August 2020, because of continued liquidity pressure and considerable expenses tied to the lawsuits with Mr. Alexander, the Debtors were forced to withdraw funds from asset managers prematurely.

---

[6]    Case No. 20-CIV-02915, Superior Court of the State of California; County of San Mateo, Southern Branch.

29.     Mr. Alexander's conduct also negatively affected the Debtors' ability to raise

outside capital.  During the summer of 2020, the Debtors sought to raise outside capital in the

form of convertible notes.  This capital infusion was meant to provide the Debtors with

additional liquidity and support the growth of their business.  Initially, the Debtors received

commitments for more than $5 million in capital.  However, after the Debtors disclosed the

lawsuit against Mr. Alexander and the irregularities connected with Mr. Alexanders' tenure as

Chief Capital Officer, many investors decided not to participate.  As a result, the Debtors were

only able to raise approximately $2.6 million in convertible notes.

A.      Loans to moKredit

30.     In May 2020, due to depressed financial markets in China and a downturn in its

business partially attributable to the COVID-19 pandemic, moKredit renegotiated the repayment

schedule for the loans extended by the Debtors.  Under the new schedule, moKredit has

continued to make payment of interest with a small amount of principal repayment.  Moreover,

during the summer of 2020, China began a series of more restrictive lending policies that added

liquidity pressure to moKredit.  Although MoKredit continued with its interest payments to the

Debtors, the absence of larger principal repayments to the Debtors reduced the Debtors' expected

financial flexibility.

31.     As a result of the foregoing, a material portion of the Debtors' assets with

moKredit could not be readily called back to compensate for hedging or redemptions in other

parts of the Debtors' business.

B.      Theft of Bitcoin

32.     In addition to Mr. Alexander's malfeasance in connection with the formation of

Cred Capital, the Debtors also suffered a loss of bitcoin (worth over $10 million as of October

2020) as a result of a fraudulent investment scheme.  Specifically, in February 2020, while still

the Chief Capital Officer of the Debtors, Mr. Alexander informed the Debtors' investment

committee of a potential investment opportunity with an entity that purported to be Quantcoin

(the "Imposter").  Based on Mr. Alexander's representations and purported due diligence, Mr.

Alexander was given permission to hire the Imposter to manage a portion of the company's

bitcoin allocation.

33.     In a series of transactions in February and April 2020, Mr. Alexander directed the

transfer of a total of 800 bitcoin to the Imposter.  After these transfers, the Debtors were set up

with an administrator purporting to be Scott Foster with Kingdom Trust.  The alleged Mr. Foster

provided what appeared to be performance updates to the Debtors on a monthly basis.

34.     In July 2020, the Debtors requested a withdrawal of $2 million from their account

with the Imposter.  Initially, it was agreed that the distribution would be made during the first

week of September 2020.  However, after confirmation of the withdrawal request, the Imposter

stopped responding to emails from the Debtors.  On August 24, 2020, the Debtors contacted

Kingdom Trust to inquire as to the July monthly statement.  Representatives for Kingdom Trust

indicated that they had no records of any accounts for the Debtors, and noted that while Scott

Foster was employed by Kingdom Trust, the contact email for Mr. Foster that had been provided

to the Debtors was fake.

35.     Upon learning of the deception, the Debtors promptly contacted the pertinent law

enforcement agency, which has initiated an investigation into the matter.

C.     Subsequent Developments

36.     As a result of the theft by the Imposter and the misappropriation of digital assets

in connection with Mr. Alexander's actions, the Debtors have been deprived of over $13 million

worth of digital assets and would-be returns which the Debtors intended to devote to improving their hedging positions.  In the absence of such hedging positions, a rapid 30% increase in the price of bitcoin during a short span in October 2020 significantly increased the Debtors' liabilities relative to their assets.

37.     Further complicating matters, negative press in connection with the theft by the Imposter, Mr. Alexander's actions, and the overall impact on the business prompted some of the Debtors' core partners to close their accounts with the Debtors.  Additional investment of outside capital also failed to materialize as a result of the legal and PR concerns associated with the Imposter.

38.     As a result of the growing liability gap, and the lack of liquidity (due to the material loss of a bitcoin connected to the above fraud and Mr. Alexander's malfeasance), the Debtors determined in late October that they should cease the inflow and outflow of all digital assets to assess their financial position and right-size their balance sheets.

39.     On October 27, 2020, the Debtors retained Paul Hastings LLP as restructuring counsel to evaluate the Debtors' strategic alternatives.  The Debtors also retained MACCO Restructuring Group LLC as financial advisor on November 4, 2020.  Furthermore, on November 3, 2020, Grant Lyon was appointed as independent director or manager (as the case may be) to replace Mr. Hua.  Mr. Lyon was also appointed as the chair and sole member of the Restructuring Committee of Cred's board of directors.  Mr. Lyon is the founder and CEO of Atera Capital, LLC.  Grant Lyon has over 30 years of experience in corporate restructuring, expert testimony and corporate governance.  Mr. Lyon has spent many years formulating and executing business plans for a diverse range of industries at every stage of a business lifecycle.

40.     The Debtors have determined that given their financial condition, they cannot reasonably expect to recover and, accordingly, on November 7, 2020, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.  The Debtors anticipate that the breathing spell afforded by the Bankruptcy Code will allow them to determine the best path forward for their creditors, employees, customers, and other stakeholders. The Debtors will use the tools available to them under the Bankruptcy Code, including certain bankruptcy causes of action and potential asset sales under section 363 of the Bankruptcy Code to maximize value for the benefit of all stakeholders.

**First Day Motions**

41.     Concurrently herewith, the Debtors have filed or will file a number of First Day Motions seeking various forms of relief designed to facilitate the transition into chapter 11.  I have reviewed each of the First Day Motions, including the exhibits thereto, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  I believe that the Debtors have satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtors, their estates, as well as that of their creditors and other parties in interest.

42.     The relief sought in each of the First Day Motion is necessary to enable the Debtors to continue operations with minimal disruption and constitute a critical element in the successful implementation of the Debtors' effort to maximize the recovery of its creditors.  To that end, the Debtors have filed the following First Day Motions:

- *Motion of Debtors and Debtors in Possession for Order Directing Joint Administration of Their Chapter 11 Cases;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File A Consolidated List of Debtors' 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties*

> by E-mail, (III) Authorizing Debtors to Redact or Withhold Publication
> of Certain Personal Identification Information, and (IV) Granting
> Related Relief;

- *Motion of Debtors for Entry of Interim and Final Orders (I)
  Authorizing Debtors to (A) Maintain Insurance Policies, (B) Pay All
  Related Obligations, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I)
  Authorizing Debtors to (A) Pay Employee Obligations and (B)
  Continue Employee Benefit Programs, and (II) Granting Related
  Relief;*

- *Debtors' Motion for Entry of Order (I) Restating and Enforcing
  Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso
  Facto Protections of Bankruptcy Code, (II) Permitting Debtors to
  Modify Automatic Stay, (III) Approving Form and Manner of Notice,
  and (IV) Granting Related Relief;*

- *Debtors' Application for Entry of Order, Pursuant to 28 U.S.C. §
  156(C), Authorizing Retention and Appointment of Donlin, Recano &
  Company, Inc. as Claims and Noticing Agent for Debtors, Nunc Pro
  Tunc to Petition Date; and*

- *Motion of Debtors for Entry of Interim and Final Orders (I)
  Authorizing Debtors to (A) Continue to Operate Their Cash
  Management System, (B) Honor Certain Prepetition Obligations
  Related Thereto, (C) Maintain Existing Business Forms, and (D)
  Continue to Perform Intercompany Transactions; (II) Granting
  Administrative Expense Status to Postpetition Intercompany Balances;
  (III) Waiving the Requirements of Section 345(b) of Bankruptcy Code;
  and (IV) Granting Related Relief.*

43.    I believe approval of the relief requested in the First Day Motions is in the best

interests of all stakeholders.

44.    In addition to the First Day Motions, the Debtors are requesting relief pursuant to

the following second day motion:

- *Motion of Debtors for Entry of Order Authorizing Debtors to (I) Reject
  Unexpired Leases of Nonresidential Real Property and (II) Abandon
  Property in Connection Therewith.*

45.     I have reviewed this motion, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2020
San Mateo, California


*/s/ Daniel Schatt*

_____

Daniel Schatt
Chief Executive Officer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DEBTOR'S OPPOSITION TO JOINT EMERGENCY OMNIBUS MOTION FOR (I) RELIEF FROM THE AUTOMATIC STAY AND (II) TRANSFER OF VENUE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 16, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Greg P Campbell     ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com**
- **Russell Clementson     russell.clementson@usdoj.gov**
- **David B Golubchik     dbg@lnbyb.com, stephanie@lnbyb.com**
- **Gregory R Jones     gjones@mwe.com, rnhunter@mwe.com;cgreer@mwe.com**
- **Gregory Kent Jones (TR)     gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com**
- **Justin E Rawlins     justinrawlins@paulhastings.com, shelbywidawski@paulhastings.com**
- **United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **February 16, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 16, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 16, 2021 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**